IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MATTHEW F. BOWMAN,

    Plaintiff,

-vs-                              No. CIV 98-0415 LH/RLP

SP PHARMACEUTICALS, L.L.C., a New
Mexico company, SP ASSOCIATES, INC., a
New Mexico corporation, H. JOSEPH LARSEN,
DONALD E. HAGMAN, and FERNANDO A.
CORREA da COSTA,,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion to Strike Jury Demand and to Hold in Abeyance Plaintiff's "Legal" Claims (Docket No. 17), and Defendants' Motion for Summary Judgment (Docket No. 21), both filed April 8, 1999. The Court, having considered the Motions, the memoranda submitted by the parties, and the applicable law, having heard oral argument of counsel on September 16, 1999, and otherwise being fully advised, finds that Defendants' Motion for Summary Judgment is well taken and will be **granted** and Defendants' Motion to Strike Jury Demand and to Hold in Abeyance Plaintiff's "Legal" Claims will be **denied as moot**.

**BACKGROUND**

This case concerns the circumstances of a leveraged management buy out by Defendant SP Pharmaceuticals, L.L.C. (SP LLC), of a sterile injectable pharmaceuticals manufacturing facility in Albuquerque, New Mexico. The individual Defendants are members of SP LLC.

Defendants Larsen and Hagman, respectively Senior Vice President, General Manager, and Vice President, Development and Quality Assurance, at the Albuquerque plant, first inquired about the possibility of a management buy out after it was acquired by Pharmacia Inc. (Pharmacia) in 1994. Following the merger of Pharmacia with Upjohn in 1995, Defendant da Costa, then President and CEO of Pharmacia, U.S., joined with Larsen and Hagman, but solely as an investor. At the invitation of these three, Plaintiff Bowman, then Vice President for therapeutic marketing with Pharmacia in Columbus, Ohio, joined the management buy out partnership in April 1996. The partners intended that da Costa would serve as Chairman of the Board of the new company, with Larsen as President and CEO, Hagman as Executive Vice President, Quality and Development, and Plaintiff as Executive Vice President, Marketing and Business Development. Each partner was to contribute $250,000 to the buy out and Plaintiff was to move to Albuquerque to join Larsen and Hagman there in managing the new company. In order to complete any buy out of the facility, the partners would need to arrange for significant outside equity and loan financing.

In late April 1996, Boatmen's Capital Markets (Boatmen's) offered to provide services to assist the partners in the buy out, including finding capital investors. In May, Larsen, Hagman, da Costa, and Bowman formed SP Associates, Inc. (SP Inc.), to facilitate a buy out transaction. Each partner provided $10,000 in initial capital funding for SP Inc. and was to receive 100 shares in the corporation. The stock, however, apparently was not distributed. At about this time, Plaintiff left

2

his position with Pharmacia and joined Neoprobe, Inc., another pharmaceutical company in Columbus. That summer da Costa also left Pharmacia and joined a company in Brazil.

Negotiations between Pharmacia-Upjohn and the partners, who were assisted by a representative of Boatmen's, ceased during the summer of 1996, and other potential buyers discussed purchasing the plant. By January 1997, however, Pharmacia-Upjohn and SP Inc. signed a letter of intent regarding the buy out. Shortly thereafter, the partners agreed, on the advice of counsel, to use a limited liability company, rather than SP Inc., to acquire the facility. They also agreed to salaries, bonuses, and benefits, not including company cars, for Larsen, Hagman, and Bowman, board compensation, and other matters. At this point they were still negotiating financing (the terms of the letter of intent were contingent upon the buyer obtaining appropriate financing), but expected to retain 66.8% of the equity in the new company.

On March 28, 1997, Larsen, on behalf of the four partners, formed SP LLC. Further negotiations among the parties, including NationsBank Capital Group (NationsBank), the equity investor with which the partners were now exclusively dealing, resulted in changes to the original agreement, including a substantial decrease in minimum value guarantees and continuing contract rates by Pharmacia-Upjohn. Additionally, forecasts for other contract customers of the plant were substantially reduced, due to a downturn in the market. Accordingly, on May 1, 1997, NationsBank proposed a financing arrangement much less favorable to the partners, decreasing management equity to 30% and increasing NationsBank's equity to 70%. The management team was to have 60% voting control of the company, however. The partners unsuccessfully attempted to negotiate a better deal with NationsBank.

On May 22nd or 23rd, 1997, Plaintiff telephoned Larsen and presented a list of proposals he wanted the other partners to consider to make up for his loss in equity. Larsen asked Plaintiff to put the proposals in writing, which he did. His proposals included performance incentives of up to 5% of all increases in company revenues; an increased bonus, payable immediately; reimbursement for any incremental tax increase, private school tuition for his two daughters, and relocation costs, including a guarantee on his Ohio house sale in the amount of $380,000-$400,000; a monthly car allowance of $700; and an employment contract guaranteeing at least two years salary and bonuses.

Plaintiff's partners did not react favorably to these proposals. On May 28th, 1997, da Costa wrote Larsen and Hagman, suggesting that they draft a letter to Plaintiff stating that neither they nor the bank could accept his position and that they had decided to proceed with a "partnership of three." (Defs.' Ex. L.) Larson drafted such a letter, dated May 29, 1997, but, never delivered it to Plaintiff. They discussed Plaintiff's memorandum with Walker Lynch Poole, a NationsBank official involved with arranging the financing transaction, sometime before May 30th, 1997, telling him that they were no longer comfortable with Plaintiff as a partner and wanted him excluded from the partnership. They also discussed the proposals with Rob Vitale of Boatmen's.

Poole was concerned about Plaintiff's proposal that he have an employment agreement:

> Our response was – to that was either you're an entrepreneur or employee, either one or the other, and this is an entrepreneurial opportunity, if you want the opportunity you need to act like an entrepreneur, that we are not, you're going to have a significant stake in the company, that an employment agreement is not appropriate as far as we're concerned.

(*Id.* Ex. 2 at 151.) Despite these misgivings, which he apparently never related to Plaintiff, Poole encouraged Larsen, Hagman, and da Costa to attempt to keep the management group together:

4

> I believe what I told them was that we viewed Matt Bowman, or a VP of sales and marketing, as an integral part of this transaction. If, in fact, their decision was to move forward without Matt Bowman, that they would put the – our investment, our willingness to make this investment in jeopardy, that it was their decision, but that this transaction with NationsBanc [sic] Capital Investor or NationsBanc [sic] Capital Corp. as an investor would have a significantly higher probability of closing if they were able to work out their differences than if they were not.
>
> . . .
>
> The exact message is that we view this role, this VP of sales and marketing, as a key and integral part of this – of the new company going forward. We have a candidate who's been identified who appears to have the right background to fulfill that role. If you guys tell us that the position is no longer filled, that is a different deal than the one we took to our partners and we need to revisit it, and there is a much higher risk that we may choose not to go forward.

(*Id.* at 155-56, 157-58.)

At the urging of Poole and Vitale, Larsen and Hagman met with Plaintiff. They agreed only to provide Plaintiff with relocation benefits equal to those Pharmacia provided its officers and Plaintiff agreed to drop his other requests. On June 2, 1997, da Costa sent Plaintiff an e-mail confirming his participation in the partnership:

> Dear Matt:
> I'm delighted you are on board. I am sure success is looming around the corner.
> See you soon. Regards
> Fernando

(*Id.* Ex. M.) Plaintiff responded, in part:

> Fernando, I have never changed my position. The financial opportunity at SP is extremely strong. My issues have been:
> 1) How to make up the loss in equity that Walker requires.
> 2) How to transfer my family to another site and keep their conditions the same.
> 3) Does the deal make sense.
> So, with regard to the loss in equity, no one is willing to bend. With regard to my family--no one has is [sic] willing to provide relief. As I conveyed to Joe and Don, I don't like it ---but it is my problem to deal with right now. I woke up Sunday morning to find my wife in tears worried about not being able to find a place. But like I said, that is my problem. Joe and Don have their worries as well.

5

(*Id.* Ex. N.)

The reconciliation was short-lived, however. Plaintiff apparently became concerned about a provision in the draft operating agreement that would allow NationsBank to sell the business without management's permission. The fifth scheduled closing for the transaction was set for the second week of June. On June 10th Plaintiff flew to Albuquerque and presented two new proposals to Larsen and Hagman: that his family remain in Ohio and he would rent an apartment in Albuquerque and commute when possible to Columbus on Fridays through Sundays, at company expense; or that he take a four-week leave-of-absence from Neoprobe to help with the start up the new company, and then serve only as a passive investor and member of the board.

The closing was postponed for other reasons, but neither the bank nor the other members of the management team found either of Plaintiff's proposal acceptable. Larsen telephoned Plaintiff on the 14th and told him that NationsBank had determined it would not close the transaction if Plaintiff remained involved and that he, Hagman, and da Costa had decided to proceed without his participation. On the 17th Larsen, Hagman, and da Costa met with NationsBank in North Carolina and persuaded them to proceed with the deal without Plaintiff. Plaintiff e-mailed da Costa on June 17th:

> Anyway, both Joe and Don have rejected [commuting] as not being appropriate. When I talked to Walker [Poole] he left me with the impression that given today's business that this could be acceptable but that it would be left up to Joe and Don. So, that is where we are in the situation. Everyone is upset with everyone and quite frankly I can sort of understand the position Joe and Don are taking. However, They [sic] are not the ones going into incremental debt beyond the initial 250,000 and moving their family and giving up significant stock options. Nonetheless, I was coming to the company via the commute and going to do an effective job. However I wanted to minimize the financial impact/risk which was [sic] having to take. Anyway, that is the situation and I wanted to make sure you were aware of it. Right now, Joe and Don and perhaps you want be [sic] out of the deal. I have to

6

tell you that I was committed to the deal and that commuting would have been very effective in my opinion. NOnetheless, [sic] Joe and Don want me out. As you know SP is is [sic] a very good investment and I will continue forward as an investor who will be able to generate a great deal of business for the facility.

(Pl's. Ex. 19 at 2.) Da Costa forwarded Plaintiff's message to the other Defendants on the 20th, commenting:

> Dear (real) partners:
> Attached is the note I have just received from our estranged ex-partner. The style denotes nervousness. I do not intend to answer it as per our agreement. He may call me over the phone, however, so I think we should insist with the lawyers to notify him officially as soon as possible.

(*Id.* at 1.)

Da Costa sent Plaintiff an e-mail on the 27th, which reads in part:

> As a result of all this, there is no way we can reconcile the objectives of the partnership with those of your own.
> This is the firm belief of the three partners (myself, Joe and Don) as well as that of the bank. Furthermore, the level of antagonism that unfortunately has developed between you and the other partners has placed our ability to finance the deal in serious jeopardy. As a result, I have been requested to communicate to you, officially, that the bank will not be willing to fund the deal if you are one of the partners. Frankly Matt, we are not going to let this deal fall through because one of the would-be partners has a different view of the opportunity.
> I am deeply sorry we have come to this conclusion but these are the facts as crudely as I can put them. I believe I would be doing you a disservice if I were to fail to tell you the facts as they are.
> The partnership will obviously refund you all the money you put down . . . plus interest, as well as any other expenses you may have incurred in this process.

(Defs.' Ex. O at 1.)

After the transaction closed on the June 30th, Plaintiff sent an e-mail to da Costa:

> . . . And now that the deal with P&U has been signed, please let me know how I should provide the Partners with the $250,000 for my portion of our partnership's equity investment.

> With regard to your proposal to refund the money I put down I am sure you understand that the proposal is not acceptable. I believe the proposal which I described to you as well as to Joe over the phone is an equitable alternative.

(*Id.* Ex. Q at 1-2.) Da Costa responded, in part:

> Your reply to the statements I made, and the points I have raised in our telephone conversation of last Saturday, June 28, is hereby acknowledged.
> I thought I was clear in explaining to you what the final opinion of the partners, and of the Banks, on your position vis-a-vis the partnership, and SP management operations, really was.
> Evidentially, judging by your reply, I was not clearly understood.
> The fact is, Matt, that Joe Larsen, Don Hagman, and myself, as well as Nations Bank [sic] and Sunwest Bank, have reached a unanimous and irrevocable decision on the constitution of the partnership that will own SP Pharmaceuticals: you are nether a member of this partnership as an equity investor, nor will any position in the managerial structure of SP Pharmaceuticals be offered to you, now or in the future.
> I regret the fact that we ended-up like this but, given the circumstances, we have agreed that this is what must be done to fulfill the objectives of the MBO and those of the seller as well.

(*Id.* at 2.)

Plaintiff brings suit asserting claims for breach of fiduciary duties and fraud. Alternatively, he pleads prima facie tort, derivative action and constructive trust on behalf of SP Inc. He seeks compensatory damages in excess of $5 million and punitive damages of $15 million.

**DISCUSSION**

Summary judgment properly may be granted if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Pleadings and documentary evidence must be liberally construed in favor of the nonmoving party. *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1379 (10th Cir. 1994). If the moving party satisfies its initial burden demonstrating

8

the absence of any genuine issue of material fact, the nonmoving party must identify sufficient evidence requiring submission of the case to a jury. *Id.*

Although the Court has great difficulty understanding the exact nature of Plaintiff's claims, it is clear from the undisputed evidence that any opportunity enjoyed by Plaintiff and the individual Defendants was prospective only and was completely dependent upon their arranging suitable financing for the acquisition of the manufacturing plant. Plaintiff argues that a genuine issue of material fact exists as to whether NationsBank made an independent decision that it would not fund the transaction if Plaintiff remained a member of the management buy out team or whether its decision was wrongfully influenced by his partners. There is, in fact, no issue of fact or credibility regarding NationsBank's position: it would not have financed the transaction with Plaintiff's participation. Without this financing, there could be no management buy out by Plaintiff -- or the individual Defendants.

Plaintiff points to Walker Poole's apparent acquiescence to his commuting proposal as proof that he was wrongly excluded from the buy out by his partners. The evidence certainly supports Plaintiff's position that commuting was not the critical issue for the bank officials. The evidence, however, also establishes unequivocally that after Plaintiff presented his second set of proposals to his partners and NationsBank, the bank independently decided that it would not participate on the equity or debt side of the transaction if Plaintiff remained a part of the buy out or retained a management position in the company.

Regarding Plaintiff's commuting proposal, Walker Poole testified at deposition:

> There were a couple of things that bothered me about his proposal. Number one was I became convinced that he was unpredictable, that it seemed like, in my mind, every time you turned around there was something new that Mr. Bowman

9

was proposing, and I really began to have concerns about his stability given that this is the first we had heard of this and that he was going to propose this on the day we were supposed to close the transactions. That was very unsettling.

      Two, having been through a number of these management buyouts before, I know how important it is for the management team to bond or gel and to form a cohesive unit or team in order to really create value and make the whole thing a success including particularly with – I'm not sure I would characterize this as a highly leveraged transaction but we had a lot of leverage on the company and there was a tremendous amount of work to be done given, in fact, we were separating this company from a major publicly traded pharmaceutical company. A lot of work spent on the weekends. A lot of weekend work on management's part typically which has, in fact, turned out to be the case, and that was going to be made increasingly difficult if Mr. Bowman was over a thousand miles away in Columbus, Ohio.

      I had some concerns about whether he was really committed to this opportunity or not and his not wanting to relocate his family gave me some concerns about whether he was truly committed to the opportunity at SP Pharmaceuticals.

(Defs.' Ex. 2 at 169-70.) According to Poole, at about the same time the individual Defendants decided they wanted Plaintiff out of the partnership, NationsBank determined "*we're not going to support a transaction with Matt Bowman involved. We will not finance a transaction with Matt Bowman as an employee.*" (*Id.* at 170-71 (emphasis added).) NationsBank reached this mutual agreement with the other partners independently:

I think we came to a mutual agreement independently. Joe and Don and Fernando talked and came to the conclusion that this was – they were not comfortable with Matt as their partner. *Myself, Mr. Merritt and Mr. Scott Poole decided that we certainly weren't willing to commit the kind of capital that we were going to commit to this opportunity with Mr. Bowman as one of the four partners.*

(*Id.* at 171 (emphasis added).)

Although Poole only two weeks before had asked the partners to work out their differences, he did not do so a second time:

      What I'm saying is I was not going to take the position that I had taken prior to Matt going to Albuquerque on May 30th and say you guys get in a room

and work it out, that enough had happened that, in my opinion, the other members of the management team had done more than their fair share to try to accommodate Mr. Bowman. They had gone above and beyond what I had thought was reasonable and I was not going to ask them to try to accommodate him anymore, that it was clear that this was a management – to me it was clear that this was a management team that was not going to work.

. . .

*I myself would not support a transaction. I just thought he was too unpredictable and didn't think this was a management team that would effectively work together.*

. . .

*I understood their decision and that left us at a point where either way the transaction was going forward without Matt Bowman. It may not close because of that, but that given the three alternatives, force them to close with Matt Bowman, not close the transaction or close the transaction without Matt Bowman, that forcing them to close with Matt Bowman was not an option, that I prefer the transaction not close and eat the significant legal costs that we had to incur as opposed to moving forward with him.*

. . .

*. . . It was also our decision, NationsBank's decision to move forward without Matt Bowman.*

(*Id.* at 175, 178, 179 (emphasis added).)

It is also undisputed that the partners, including Plaintiff, agreed among themselves, months before their falling out, to abandon the entity SP Inc. Therefore, no valid claims may be asserted by Plaintiff on its behalf. At the hearing the Court summarily granted summary judgment on Plaintiff's fraud and prima facie tort claims, finding no genuine issue of material fact as to either. Given that any opportunity Plaintiff may have enjoyed with regard to the buy out transaction was contingent on financing and that NationsBank independently determined that because of his behavior and conduct it would not proceed with him as a member of the management buy out team, summary judgment also must be granted as to all remaining claims.

11

WHEREFORE,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Docket No. 21), filed April 8, 1999, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Jury Demand and to Hold in Abeyance Plaintiff's "Legal" Claims (Docket No. 17), filed April 8, 1999, is **DENIED AS MOOT**.

_____
**UNITED STATES DISTRICT JUDGE**